Minnesota Tea Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

E. C. Peterson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

A. F. Peterson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

L. T. Peterson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 54227, 60837–60839.   Promulgated June 30, 1933.

*C. J. McGuire, Esq.*, for the petitioners.
*Prew Savoy, Esq.*, and *George D. Brabson, Esq.*, for the respondent.

OPINION.

Sternhagen: The respondent determined deficiencies in the income taxes of the petitioners as follows: Minnesota Tea Co., $11,587.64 for the period January 1 to August 24, 1928; E. C. Peterson, $15,982.31 for 1928; A. F. Peterson, $646.66 for 1928; and L. T. Peterson, $15,974.76 for 1928.   There is no explanation for the use of a short tax period for the Minnesota Tea Co., although it is stated in the notice of deficiency of January 26, 1931, that "it is still a going concern."   The facts are stipulated, and findings are unnecessary.

The Minnesota Tea Co., engaged in the retail grocery business, negotiated in 1928 for the transfer of its business to the Grand Union Co. Its shares were all owned by the three Petersons, and, so far as appears, still are. Before making the transfer to the Grand Union Co., it transferred its real estate and some miscellaneous property to the Peterson Investment Co., newly created for the purpose, in exchange for the Peterson Co.'s shares, which it immediately distributed proportionately among its three shareholders. Thus reduced, the entire assets of the Minnesota Co., the statutory cost of which was $254,646.62, were transferred to the Grand Union Co. for $426,842.52 cash and 18,000 shares (voting trust certificates) of Grand Union no-par common, which it agreed not to sell for a year. The 18,000 shares were neither distributed nor sold. The $426,842.52 was distributed among the three shareholders, who assumed, and paid, the Minnesota Co.'s liabilities amounting to $106,-471.73. At the time of the receipt by the Minnesota Co. of the cash and shares, its undistributed earnings and profits were $109,442.83. The outstanding shares of the Grand Union Co. were at this time 239,726, and they were being sold on the New York Stock Exchange for around 30.

Several questions are raised as to the gain resulting to each of the petitioners from these transactions and as to the recognition thereof as a statutory matter; but such questions are predicated upon the idea that there was a statutory reorganization, as that term is defined by section 112 (i) (1),[1] Revenue Act of 1928. Whether there was such a reorganization must, therefore, be first decided. If there was no such reorganization, there is no foundation for the petitioners' attack on the deficiencies, and the respondent's determinations must be sustained; while if a statutory reorganization occurred, the measure of the resulting tax must be determined with regard to other statutory provisions.

At the time when the deficiencies were determined, there was a disposition to read the statutory definition with a superficial regard for its language, and thus to say that the acquisition by one corporation of substantially all the properties of another corporation was

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

*per se* a reorganization. The extent of this literalism is indicated by *Sarther Grocery Co.* v. *Commissioner*, 63 Fed. (2d) 68, in which the view was urged by the taxpayer that a sale for cash of all its properties by one corporation to another was a reorganization. See *Tulsa Oxygen Co.*, 18 B.T.A. 1283; *National Pipe & Foundry Co.*, 19 B.T.A. 242; *First Nat. Bank of Champlain*, *N.Y.*, 21 B.T.A. 415; *Robert D. Green*, 24 B.T.A. 719. In *Cortland Specialty Co.*, 22 B.T.A. 808, the Board gave a broader consideration to the definition and, although there was " no question whatsoever but that substantially all of the [one] company's properties were acquired by the [other]," held that there was no reorganization.

In the development of the law by the courts, the literal view has never gained a foothold. The Fifth Circuit Court of Appeals, in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 57 Fed. (2d) 188, the first court decision on the subject, took quite the opposite view, saying:

It must be assumed that in adopting paragraph (h) (of section 203, Revenue Act of 1926, to which the section now under consideration is similar) Congress intended to use the words, "merger" and "consolidation" in their ordinary and accepted meanings. Giving the matter in parenthesis the most liberal construction, it is only when there is an acquisition of substantially all the property of another corporation *in connection with a merger or consolidation* that a reorganization takes place. Clause (B) of the paragraph removes any doubt as to the intention of Congress on this point.

A few months later the Second Circuit Court of Appeals, in *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937, held that the acquisition by one corporation of all the properties of another was not to be treated by itself as a statutory reorganization; that such acquisition, to be within the statute, must be related to what would in general legal parlance be referred to as a reorganization, but that the concept of such reorganization was not as restricted as the Fifth Circuit Court of Appeals had held, as being confined to technical mergers or consolidations, but could include other arrangements whereby there was substantially a continuance of the same interests in the business and properties affected, the change being only a modification in corporate form or structure.

The Supreme Court in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462, held that the absolute view of the Fifth Circuit Court of Appeals was too narrow an interpretation of the statute. The Supreme Court cited with approval the opinion of the Second Circuit Court of Appeals in *Cortland Specialty Co.* v. *Commissioner*, *supra*. It said that the parenthetical expression, " the acquisition of substantially all the properties of another corporation," has the effect of " expand[ing] the meaning of ' merger or consolidation ' so as to include some things which partake of the

594

nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness can not be designated as either merger or consolidation." It held that the situation before it "has no real semblance to a merger or consolidation."

In the light of these decisions, it is now the law that the parenthetical expressions may not be considered separately, but only as parts of the entire section of the statute, and hence that the acquisition by one corporation of substantially all of another's properties is not, of itself, enough to constitute a statutory reorganization, but must be part of a strict merger or consolidation or of something which partakes of the nature of a merger or consolidation and has a real semblance to a merger or consolidation and involves a continuance of essentially the same interests through a modified corporate structure.

This construction of part (A) of the definition must be shaped to fit into the definition as a whole. There is a plain intendment to correlate part (A) and part (B), for both deal with the change of ownership among corporations of their properties. Whether there be any substantial significance in the fact that (A) treats of the *acquisition*, thus apparently emphasizing the receiving side of the transaction, while (B) treats of the transfer, the opposite facet, is perhaps unimportant here; for, however that may be, they must both be construed to effect.[2] (A) may not be read so broadly in respect of the acquisition of property for stock as to stultify (B), dealing with the transfer of property for stock. Such a transfer, to be a reorganization under (B), must comply with the prescribed condition,—" if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred," and it would not do to treat as a reorganization a transfer for less than control through the device of calling it a merger and thus bringing it within (A). While, therefore, there is latitude in the term merger, there is at the same time the necessity of keeping it within the bounds of (A) and not invading (B).

There is substantial difficulty in this. Some overlapping seems inevitable. It is therefore better not to attempt to formulate a rule of construction, which by its very language may serve to constrict the operation of the statute more narrowly than was intended. It is only important to fulfill the purpose indicated by the language of the statute. The underlying purpose of this section is to permit a change in the form of ownership which in essence does not affect

---

[2]An examination of the history of these provisions seems to indicate that there was no deliberate design to differentiate between the phraseology of (A) and (B), but only to bring together, within the definition of reorganization, language which had already been used in separate parts of the statutory scheme.

continuance of the same actual ownership of substantially the same properties without fear of tax at the time of the formal change. In the case of a true merger or consolidation, the immunity from tax is extended beyond this purpose, since to the shareholder the result is to give him new shares representing properties in some of which he theretofore had no interest. While through modified forms he has a continuing interest in the same assets, although in a lessened proportion, he also acquires an interest in entirely new assets.

Is this, then, an arrangement which for the purpose of the statute so far partakes of the nature of a merger or consolidation or resembles it as to bring about the same tax result, notwithstanding it is not the transfer of properties for controlling shares of the transferee? Three persons owning all the shares of a corporation conducting a local business cause the corporation's assets to be transferred to another existing corporation with nation-wide activities, for cash, $426,842.52, which is distributed to them, and approximately 7½ percent of the shares of the large corporation, worth approximately $540,000. The local corporation continues its existence, holding as its assets the acquired shares, and the individuals continue to be the owners of their original shares. We think it is not within the scope of the statute.

The nature of the transaction is the same as that treated in (B) except for the condition. Omitting consideration of the cash received, since its effect is found rather in subdivision (d) than in the definition of subdivision (i), there was a transfer by one corporation of all its properties to another for stock in the transferee, but instead of being in control, which by subdivision (j) means the ownership of at least 80 percent of the transferee's shares, there is ownership by the transferor of only 7½ percent of such shares. Thus the transaction appears to be far from a continuing interest in the same property through a mere change in forms of ownership but rather an almost complete change in the essential assets owned; and this still disregards the large proportion of cash received.

This wide departure from the percentage of stock upon which (B) is conditioned, in a transaction which is otherwise within that part of the definition, should make us slow to find (A) nevertheless applicable. The parties to the transaction deliberately for their own purposes refrained from a merger. Furthermore they chose an arrangement which avoided the result of a merger. Instead of the shareholders of the Minnesota Co. owning shares of the Grand Union Co., as they would have if there had been a merger, they continued to own Minnesota shares; and instead of the Minnesota Co.'s disappearance as in a merger, its existence and powers continued, and as the owner of the Grand Union shares it brought about a freedom from immediate tax upon the dividends upon such Grand Union

shares, since by section 23 (p) such dividends are deductible by a corporation simultaneously with their receipt as gross income, while to an individual shareholder dividends are subject to surtax.

This decision does not restrict (A) to technical mergers. It still leaves room for a more expansive application of the statute. It might be suggested, for example, that by having the assets of the Minnesota Co. transferred to the Grand Union in exchange for shares and then having the Minnesota Co. promptly distribute such shares among its own shareholders in liquidation and dissolve, so that in all substantial respects the outcome would have been the same as if a true merger had occurred, the petitioners might properly have invoked part (A) of the definition. How much further from a true merger they might have gone and yet achieved what the statute calls a reorganization, we do not attempt to say. It is enough now to hold that the facts before us go further than the statute implies, and that there was no reorganization.

In this view, the Minnesota Co. realized a gain measured by the difference between the $254,646.62, cost of its property, and $966,-842.52, being the sum of $426,842.52 cash and $540,000, the value of the 18,000 shares of Grand Union Co. Section 111. This gain of $712,195.90 may not escape recognition. Section 112 (a).

The question is suggested whether the 18,000 shares of Grand Union stock were without fair market value since there was a covenant against its sale within a year after its receipt. The petitioners say they do not press the point before the Board, but "preserve it for the purpose of the record." The restriction was a contractual obligation and therefore voluntary, and does not, in our opinion, leave the shares without fair market value, as that term is meant to be used in the statute. See *Newman* v. *Commissioner*, 40 Fed. (2d) 225. This fair market value we find to be $30 a share.

As to the Petersons, it follows from the foregoing that the distribution to them, as shareholders, of the cash surplus was, after being reduced by the amount of the liabilities assumed, $106,471.73, an ordinary dividend subject to surtax.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Marquette concurs in the result.

Van Fossan, dissenting: It seems clear to me that the prevailing opinion goes much further than is warranted either by the language of the revenue acts or by the authoritative decisions of the courts. It reads into the statute a concept and a limitation neither written in nor intended by Congress.

Black, dissenting: The effect of the majority opinion as I construe it is to interpret paragraph (1) (A) of section 112 (i) of the Revenue Act of 1928, which now reads: "(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)" as if the last clause quoted above were made to read: "or substantially all the properties of another corporation *if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the* NO *properties are transferred.*" I find no warrant for reading into the statute this language which is not there.

In support of the conclusion which it reaches, the majority opinion cites *Cortland Specialty Co.*, 22 B.T.A. 808; affd., 60 Fed. (2d) 937, and *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462. I do not think these two cases are authority for what the Board holds in the instant case.

In the *Cortland Specialty Co.* case, one corporation transferred its assets to another in consideration of cash and promissory notes. The Board held that the transaction was not a reorganization, but simply a sale by one corporation of its assets to another. This view was upheld by the Circuit Court of Appeals for the Second Circuit, the court holding that the transaction did not come within section 203 (e), Revenue Act of 1926, because the property received for the assets sold did not include "stock or securities", the notes received not being so classifiable. There was no continuity of interest on the part of the transferor corporation or its stockholders in the property sold because neither the selling corporation nor its stockholders received stock in the purchasing corporation. The situation in *Pinellas Ice & Cold Storage Co.* was pretty much the same. There two corporations owned by the same stockholders sold their assets to a third corporation for cash and promissory notes. No stock or other securities of the purchasing corporation were received. The Supreme Court held that the transaction was a mere sale of assets and did not partake of any of the features of either a merger or a consolidation. The court was, however, careful to point out that the words within the parenthesis of (A) might not be disregarded. On that point the court said:

\* \* \* The words within the parenthesis may not be disregarded. They expand the meaning of "merger" or "consolidation" so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation. But the mere purchase for money of the

# 598

assets of one company by another is beyond the evident purpose of the provision, and has no real semblance to a merger or consolidation. Certainly, we think that to be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short term purchase money notes.

In the instant case the seller acquired an interest in the affairs of the purchasing company to the extent of 18,000 shares (voting trust certificates) of its no-par common stock. This, in my opinion, gave the transferring corporation that continuing interest in the new enterprise which brings the transaction within the definition of (A) above quoted. As to the cash received in the transaction, it is taxable to the corporation to the extent of the gain realized, unless distributed to the stockholders in pursuance of the plan of reorganization. This is so by reason of section 112 (d) of the Revenue Act of 1928, which reads:

If an exchange would be within the provisions of subsection (b) (4) of this section if it were not for the fact that the property received in exchange consists not only of stock or securities permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then—

(1) If the corporation receiving such other property or money distributes it in pursuance of the plan of reorganization, no gain to the corporation shall be recognized from the exchange, but

(2) If the corporation receiving such other property or money does not distribute it in pursuance of the plan of reorganization, the gain, if any, to the corporation shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property so received, which is not so distributed.

It is my understanding that it is under the foregoing provision that the Commissioner has determined that there is a taxable gain to the corporation in this proceeding to the extent of $106,471.73. On the date that petitioner, the Minnesota Tea Co., transferred all of its assets to the Grand Union Co. for 18,000 shares of its common stock plus $426,842.52 in cash, pursuant to resolutions authorizing the transfer, it immediately distributed the cash pro rata to its shareholders, the petitioners, E. C., A. F., and L. T. Peterson, who assumed and thereafter duly discharged all of its liabilites. The petitioners Peterson received cash in the amount of $426,842.52 and assumed and paid liabilities of $106,471.73, each thereby receiving his pro rata portion of the net distribution of $320,370.79. Respondent has held this taxable to each of the petitioners Peterson as dividends received from the corporation and has held the $106,471.73 taxable to the corporation as profit from the transfer of assets, received in cash and not distributed to the stockholders in pursuance to a plan of reorganization. The Commissioner contends that this $106,471.73 was impressed with a trust, that the stockholders should use it to pay the debts of the corporation and that this is

not a distribution to stockholders within the meaning of the statute above quoted, but is equivalent to the corporation itself using the money to pay its debts. With this view I agree. The majority opinion, however, does not affirm the deficiency against the corporation on that ground, but on the ground that there was no reorganization and the whole transaction was taxable. With this view, for reasons I have already stated, I disagree. I do not discuss the question as to whether the $320,370.79 admittedly distributed to the petitioners Peterson is all taxable to them as dividends as determined by respondent, or only a part as contended by petitioners. The majority opinion having affirmed the deficiencies on the ground that there was no reorganization, I am content to record my dissent to that holding.